Sheehan & Associates, P.C.
Spencer Sheehan
60 Cutter Mill Rd Ste 409
Great Neck, NY 11021-3104
Tel:  (516) 268-7080
spencer@spencersheehan.com

United States District Court
Southern District of New York                              7:21-cv-01077

| | |
|---|---|
| Michael  Cavallero,  individually  and  on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Class Action Complaint |
| G.T Japan, Inc., | |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     G.T Japan, Inc. ("defendant") manufactures, distributes, markets, labels and sells mochi ice cream under the Maeda-En brand represented as flavored only by vanilla and not containing any artificial flavors ("Product").

2.     Mochi is a Japanese sweet rice cake and mochi ice cream is a combination of ice cream wrapped in mochi dough.



3.     Defendant's representations of "Vanilla" and no mention of artificial flavor give consumers the impression they are buying a premium product with only natural flavoring ingredients from the characterizing vanilla ingredient.

4.     Consumers prefer products without added flavor statements – "naturally flavored," "other natural flavor," "artificially flavored" – because this tells them the flavor comes from the characterizing ingredient.

5.     Consumers perceive such products as being more natural than other products.

6.     Vanilla is the top selling ice cream flavor.

7.     The vanilla bean is heated in the sun for weeks, soaked in alcohol solution and its

flavor constituents extracted (vanilla extract).

8.     Vanillin (3-methoxy-4-hydroxybenzaldehyde) is a major component of natural vanilla extract.

9.     Vanillin is found in the form of its β-D-glucoside (glucovanillin) in green vanilla beans.

10.    The curing process, including the hydrolysis of its β-D-glucoside, leads to the release of vanillin from glucovanillin, at concentrations of 1-4% of dry weight of cured beans.

11.    The isolation of vanillin in the late 19th century and the low-cost vanillin resulted in foods purporting to contain vanilla, which either contained no vanilla or a trace or *de minimis* amount, boosted by synthetic vanillin.

12.    Natural vanillin is not isolated commercially and is used as part of "vanilla extract."

13.    Vanillin confers a mainly sweet and creamy flavor to food products, with a lackluster "chemical-like" taste and odor because it lacks the other molecules in vanilla.

14.    Vanilla's unique and complex flavor is due to the hundreds of odor-active compounds such as acids, ethers, alcohols, acetals, heterocyclics, phenolics, hydrocarbons, esters and carbonyls.

15.    Vanillin contributes to less than one-third of the overall flavor/aroma impact of vanilla.

16.    Methyl cinnamate and cinnamyl alcohol provide cinnamon and creamy notes.

17.    P-cresol contributes flavor notes described as woody and spicy.

18.    Acetovanillone provides a sweet, honey taste.

19.    P-hydroxybenzoic acid and vanillic acid are significant phenolic compounds which contribute to vanilla's aroma.

20.    4-methoxybenzaldehyde (p-anisaldehyde) and 4-methoxybenzyl alcohol (p-anisyl alcohol) provide creamy and floral flavor notes.

21.    Demand for real vanilla "has been steadily increasing…due to consumer demand for natural foods that are free of artificial ingredients."[1]

22.    According to one flavor supplier, today's consumers "want real vanilla, not imitation [vanilla] flavoring."

A.    Vanillin – "natural flavor"

23.    The only natural vanillin is from vanilla beans.

24.    Vanillin may, though seldom is, produced through processes that yield a natural flavor consistent with the FDA definition of "natural flavor:"

> [T]he essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional. Natural flavors include the natural essence or extractives obtained from plants listed in §§ 182.10, 182.20, 182.40, and 182.50 and part 184 of this chapter, and the substances listed in § 172.510 of this chapter.

21 C.F.R. § 101.22(a)(3).

25.    This means that a "natural flavor" must be made from a natural source and through a natural process, such as distillation, roasting, heating, enzymolysis or fermentation.

26.    While enzymatic reactions exist to convert eugenol (and other natural sources) to vanillin, these methods are seldom used.

27.    For instance, the rate of conversion of eugenol to vanillin is very low, in part due to the toxicity and limited water solubility of eugenol.

---

[1] Chagrin Valley Soap & Salve Company, FAQs, Why Are The Prices of Vanilla Bean Products Always Increasing?

4

B.  Artificial Flavor Vanillin – 101.22

28.    Artificial flavor is defined as any flavoring from a synthetic source or made through an artificial process. 21 C.F.R. § 101.22(a)(1).

29.    The sources of vanillin are petroleum (guaiacol), lignin (tree pulp), eugenol or ferulic acid.

30.    Guaiacol is the source of 85% of vanillin, and obtained from the synthetic petrochemicals, benzene and propylene, whose industrial source is petroleum.

31.    Converting guaiacol to vanillin entails condensation with glyoxylic acid.

32.    The processes include chemical reactions such as decarboxylation and aromatic substitution.

33.    Vanillin is also derived from lignin, present in sulfite wastes of the wood pulp industry.

34.    These sulfite wastes are not considered natural source materials because they contain chemicals that were used in the processing of wood pulp.

35.    Lignin is difficult to degrade by natural means, which is why production of vanillin from lignin entails chemical processes.

36.    Lignin is degraded either with sodium hydroxide or with calcium hydroxide solution and simultaneously oxidized in air in the presence of catalysts.

37.    When these chemical reactions are completed, the solid wastes and vanillin are removed from the acidified solution with a solvent, e.g., butanol or benzene, and reextracted with sodium hydrogen sulfite solution.

38.    The vanillin is subjected to reacidification with sulfuric acid followed by vacuum distillation, and several recrystallization cycles.

39.    Vanillin derived from lignin is an artificial flavor because the sulfite wastes of wood

5

pulp are not a natural source, and the chemical reactions used to convert it to vanillin are not natural processes.

40.   Eugenol, the major constituent of clove oil, has been used a source of vanillin.

41.   The first method of converting eugenol to vanillin requires isomerization of eugenol to isoeugenol under alkaline conditions, followed by side-chain cleavage to vanillin and two-carbon moiety under acidic conditions.

42.   The second method of converting eugenol to vanillin involves the intermediary of coniferyl alcohol which is oxidized to ferulic acid.

43.   The ferulic acid is subjected to high heat of 800 degrees Celsius, high amounts of pressure, 20 atmospheric pressure units, and chemical catalysts, sodium hydroxide or sodium chloride.

44.   The high heat, high pressure and chemical catalysts are outside of what is considered a natural process for producing a natural flavor.

45.   Vanillin made through any of these methods is required to be declared as an artificial flavor because it is the product of non-natural processes and/or the starting material is a synthetic substance.

C.   Artificial Flavor – Ice Cream

46.   According to The Flavor and Extract Manufacturers Association of the United States ("FEMA"), "[W]hen consumers "purchase ice cream labeled as 'vanilla ice cream' they expect it to be flavored with vanilla flavoring derived from vanilla beans *unless labeled otherwise*.[2] (emphasis added).

---

[2] John B. Hallagan and Joanna Drake, The Flavor and Extract Manufacturers Association of the United States, "Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.," Perfumer & Flavorist, Apr. 25, 2018.

47.    This is codified in regulations for ice cream flavoring. 21 C.F.R. §135.110(f)(2)(i) ("If the food contains no artificial flavor, the name on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., "vanilla", in letters not less than one-half the height of the letters used in the words "ice cream"").

48.    In contrast to non-ice cream foods, "Flavors which are derived from natural sources other than the characterizing flavor and simulate, resemble or reinforce the characterizing flavor, are considered artificial flavors."[3]

49.    This means that *any* flavor from a non-vanilla bean source is considered an artificial flavor in vanilla ice cream.

II.    Ingredient List is Misleading

50.    Analytical testing of the Product reveals it contains added vanillin from non-vanilla sources because (1) the amount of vanillin was significantly greater than it would be if it were only present because of the Product containing vanilla extract as part of the "Natural Flavor" and (2) the vanillin was unaccompanied by the other flavoring components of vanilla from the vanilla plant, even though these compounds were screened for.

51.    For instance, the Product's flavoring failed to reveal detectable levels of methyl cinnamate, cinnamyl alcohol, p-cresol, acetovanillone, p-hydroxybenzoic acid, 4-methoxybnzaldehyde (p-anisaldehyde), 4-methyoxybenzyl alcohol (p-anisyl alcohol) and/or vanillic acid, even though these compounds were analyzed for.

52.    The absence of these aromatic compounds also means the Product contains, at most, a trace or de minimis amount of vanilla.

53.    The Product's ingredient list tacitly reveals it is not flavored exclusively with vanilla

---

[3] The International Dairy Foods Association ("IDFA").

because it lists the generic ingredient "natural flavor" instead of vanilla extract.

54.     The Product's ingredient list misleadingly conceals the added vanillin as part of the

generic "natural flavor" instead of using the specific, non-generic name of the ingredient –

"vanillin" or "artificial flavor." 21 C.F.R. § 101.4(b)(1).

**ICE CREAM INGREDIENTS:** MILK, CREAM, SUGAR, CORN SYRUP SOLIDS, SKIM MILK, WHEY, NATURAL FLAVOR, GUAR GUM, MONO & DIGLYCERIDES, ANNATTO EXTRACT (FOR COLOR), CELLULOSE GUM, LOCUST BEAN GUM, CARRAGEENAN

**ICE CREAM INGREDIENTS:** MILK, CREAM, SUGAR, CORN SYRUP SOLIDS, SKIM MILK, WHEY, NATURAL FLAVOR, GUAR GUM, MONO & DIGLYCERIDES, ANNATTO EXTRACT (FOR COLOR), CELLULOSE GUM, LOCUST BEAN GUM, CARRAGEENAN.

55.     Even if reasonable consumers were to investigate Defendant's claims on the

Product's front label by scrutinizing the ingredient statement on the back, consumers would still

be unable to verify whether the Product contained the artificial flavor of vanillin.

56.     According to an article on Yahoo Food in 2015, "The One Thing You Need to Know

When Buying Vanilla Ice Cream," "Brands that print phrases like 'natural vanilla' [or 'natural

flavor'] on their packages may actually be pushing products that contain anything but."[4]

57.     The Yahoo article continued, "Vanilla extract is the key to buying ice cream with

good vanilla flavor…If it doesn't say vanilla extract, walk on by" because the vanilla "taste" is

"actually imitation extract made from wood pulp."[5]

58.     The IDFA and FEMA have stated that vanilla ice cream should only contain

flavoring from vanilla beans, *viz*, vanilla extract, on the ingredient list.

59.     Dairy expert "Scott Rankin, a professor of food science at the University of

---

[4] Yahoo Food, The One Thing You Need to Know When Buying Vanilla Ice Cream, May 20, 2015.
[5] See 21 C.F.R. §135.110(f)(2)(i) ("If the food contains no artificial flavor, the name on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., 'vanilla'").

8

Wisconsin-Madison, explained that the different wordings on the labels amount to an industry shorthand for specific kinds of natural or artificial flavorings."

60.   For instance, "natural vanilla flavor" often refers to "vanillin extracted from wood."

61.   "Natural flavor" on the other hand, "(with no mention of vanilla at all) indicates just a trace of natural vanilla (there's no required level) and other flavorings such as nutmeg that merely trigger an association with vanilla."

62.   Defendant's "Natural Flavor" contains added artificial vanillin yet fails to disclose it separately.

63.   The  added vanillin is an artificial flavor in the context of ice cream flavor labeling because it is not from vanilla beans.

64.   The added vanillin is also an artificial flavor because it is derived from an artificial source material and made through an artificial process.

65.   Although the vanillin used to simulate the Product's characterizing vanilla flavor is (1) not from vanilla beans, (2) from an artificial petrochemical source and (3) made through an artificial process, Defendant pretends otherwise, conflating the natural and artificial flavoring and deceiving consumers.

66.   Because the Product contains the artificial flavor of vanillin that simulates and reinforces the characterizing vanilla flavor, the front label is required to state, "Artificially Flavored." 21 C.FR. §135.110(f)(2)(iii).

67.   Plaintiff and Class Members purchased the Product because they reasonably believed it was flavored only with natural ingredients like vanilla and did not contain artificial flavors.

68.     Surveys have consistently found that at least seven out of ten consumers avoid artificial flavors.[6]

69.     Reasons for eschewing artificial flavors include a desire to avoid synthetic ingredients which have been associated with detrimental health effects.[7]

70.     "All demographics [of consumers] from Generation Z to Baby Boomers – say they would pay more" for foods with no artificial flavors because they are perceived as more natural.[8]

71.     Products made with natural instead of artificial flavors are "more popular than ever and approaching performance parity with their synthetic counterparts."[9]

72.     The label and ingredient list fail to disclose the presence of artificial flavors.

73.     Defendant misrepresented the Product through affirmative statements, half-truths, and omissions.

74.     Defendant sold more of the Product and at higher prices than it would have in absence of this misconduct, resulting in additional profits at the expense of consumers.

75.     Had plaintiff and the proposed class members known the truth, they would not have bought the Product or would have paid less for it.

76.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $6.99 for boxes of six 2 OZ pieces, excluding tax, compared to other similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations.

---

[6] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018.
[7] Donna Berry, Playing the natural flavor game, Food Business News, Jan 1, 2018.
[8] Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[9] Kimberly Decker, Advances in natural flavors, Food & Beverage Insider Oct 12, 2020.

Jurisdiction and Venue

77.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28

U.S.C. § 1332(d)(2).

78.     Under CAFA, district courts have "original federal jurisdiction over class actions

involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal

diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

79.     Plaintiff Michael Cavallero is a citizen of New York.

80.     Defendant G.T Japan, Inc. is a Texas corporation with a principal place of business

in Irvine, Orange County, California.

81.     Diversity exists because plaintiff Michael Cavallero and defendant are citizens of

different states.

82.     Upon information and belief, sales of the Product and statutory and other monetary

damages, exceed $5 million during the applicable statutes of limitations, exclusive of interest and

costs.

83.     Venue is proper because a substantial part of the events or omissions giving rise to

the claim occurred here – plaintiff's purchase of the Product.

84.     Venue is further supported because many class members reside in this District.

Parties

85.     Plaintiff Michael Cavallero is a citizen of White Plains, Westchester County, New

York.

86.     Defendant G.T Japan, Inc. is a Texas corporation with a principal place of business

in Irvine, California, Orange County.

87.     Defendant is the premier American importer and seller of gourmet Japanese foods,

including authentic Matcha Tea, green tea ice cream and mochi ice cream.

88.    The Product is sold to consumers from retail and online stores of third-parties across the country.

89.    During the relevant statutes of limitations for each cause of action alleged, plaintiff purchased the Product within his district and/or State in reliance on its representations and omissions.

90.    Plaintiff bought the Product on one or more occasions within the statute of limitations from one or more locations, including between November 30, 2018 and November  30, 2020, , from Whole Foods Market, 110 Bloomingdale Rd White Plains, NY 10605.

91.    Plaintiff bought the Product at or exceeding the above-referenced price because he wanted to buy a product with the qualities and attributes represented herein.

92.    Plaintiff would not have purchased the Product in the absence of Defendant's misrepresentations and omissions.

93.    The Products was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

94.    Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance that Product's labeling is consistent with its composition and origins.

<u>Class Allegations</u>

95.    The class will consist of all purchasers of the Product who reside in New York during the applicable statutes of limitations.

96.    Plaintiff seeks class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

97.    Common questions of law or fact predominate and include whether defendant's

representations were and are misleading and if plaintiff and class members are entitled to damages.

98.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

99.   Plaintiff is an adequate representative because his interests do not conflict with other members.

100.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

101.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

102.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

103.  Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>
<u>(Consumer Protection Statutes)</u>

104.  Plaintiff incorporates by reference all preceding paragraphs.

105.  Plaintiff and class members desired to purchase a product described and identified by Defendant – flavored only by vanilla ingredients and not containing artificial flavor.

106.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

107.  Defendant misrepresented the Product through its statements, omissions, ambiguities, half-truths and/or actions.

108.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability</u>
<u>and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

109.   Plaintiff incorporates by reference all preceding paragraphs.

110.   The Product was manufactured, labeled and sold by defendant and warranted to plaintiff and class members that it possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which it did not.

111.   The amount and proportion of the characterizing component, vanilla, and presence of artificial flavors, has a material bearing on price or consumer acceptance of the Product because consumers are willing to pay more for such components.

112.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

113.   This duty is based, in part, on Defendant's position as one of the most recognized companies in the nation in this sector.

114.   Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

115.   Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years regarding the Product.

116.   The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

117.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Negligent Misrepresentation

118.  Plaintiff incorporates by reference all preceding paragraphs.

119.  Defendant had a duty to truthfully represent the Product, which it breached.

120.  This duty is based on defendant's position, holding itself out as having special knowledge and experience in the sale of the product type.

121.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

122.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

123.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Fraud

124.  Plaintiff incorporates by reference all preceding paragraphs.

125.  Defendant misrepresented and/or omitted the attributes and qualities of the Product.

126.  Defendant's fraudulent intent is evinced by its failure to accurately disclose the issues described herein, when it knew not doing so would mislead consumers.

127.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Unjust Enrichment

128.  Plaintiff incorporates by reference all preceding paragraphs.

129.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek

restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   February 7, 2021

                                                    Respectfully submitted,

                                                    Sheehan & Associates, P.C.
                                                    /s/Spencer Sheehan
                                                    _____
                                                    Spencer Sheehan
                                                    60 Cutter Mill Rd Ste 409
                                                    Great Neck NY 11021-3104
                                                    Tel: (516) 268-7080
                                                    Fax: (516) 234-7800
                                                    spencer@spencersheehan.com
                                                    E.D.N.Y. # SS-8533
                                                    S.D.N.Y. # SS-2056

7:21-cv-01077
United States District Court
Southern District of New York

Michael Cavallero, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

G.T Japan, Inc.,

Defendant

## Class Action Complaint

```
        Sheehan & Associates, P.C.
         60 Cutter Mill Rd Ste 409
         Great Neck NY 11021-3104
            Tel: (516) 268-7080
            Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  February 7, 2021

/s/ Spencer Sheehan
Spencer Sheehan